Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Co-Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC ARDOLINO, *et al*., | Case No: 2:16-cv-00348-RGK-GJS |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| MANNKIND CORPORATION, *et al*., | |
| Defendants. | **JURY TRIAL DEMANDED** |

Co-Lead Plaintiffs Vladimir Rivkin ("Rivkin") and Masoud Paydar ("Paydar") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Class Action Complaint For Violation Of The Federal Securities Laws against Defendants MannKind Corporation ("MannKind" or the "Company"), Matthew Pfeffer ("Pfeffer"), and Hakan Edstrom ("Edstrom"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through their attorneys, which included, among other things, interviews of persons with knowledge, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MannKind, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired MannKind securities between August 10, 2015 and January 5, 2016, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities law and to assert claims and pursue remedies under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its tops officials.

2.     MannKind is a biopharmaceutical company that focuses on the development of new drugs.  Afrezza, the Company's only United States Food and Drug Administration ("FDA") approved product, is a rapid-acting inhaled insulin for adults with type 1 and type 2 diabetes.  The FDA approved Afrezza in June, 2014.

Amended Class Action Complaint for Violation of the Federal Securities Laws

3.      MannKind tied its financial success to its ability to successfully commercialize Afrezza.  In its form 10-K for the year 2014, filed with the SEC on March 2, 2015 ("2014 10-K"), MannKind acknowledged that "[w]e have expended significant time, money and effort in the development of our only approved product, Afrezza.  We anticipate that in the near term, our ability to generate revenues will depend on the successful commercialization of Afrezza."

4.      Developing a commercially successful inhaled or oral insulin has been the "holy grail" of diabetes treatment for decades, as it greatly reduces the need for diabetics to inject themselves with insulin.  At the time of Afrezza's FDA approval, diabetics had to inject their insulin to manage their blood-glucose concentration after meals.

5.      Because diabetics inhale Afrezza, the FDA was concerned about its use by smokers, and by those suffering from serious pulmonary diseases or conditions such as chronic pulmonary disease or asthma, as well as the long-term effects of inhaling a hormone such as insulin.  Accordingly, the FDA imposed strict guidelines for physicians prescribing Afrezza.  Doctors were required to perform a pulmonary function test called a spirometry test, using a device called a spirometer, on prospective Afrezza patients, to determine if a patient had an existing pulmonary disease.  The FDA further required updated pulmonary function testing every six months.  Finally, the FDA mandated that

- 3 -

patients undergo a ten day trial period taking Afrezza, followed by a full prescription only if the patient reacted well.

6.     On September 24, 2014, MannKind announced that on August 11, 2014, it had entered into a worldwide collaboration and licensing agreement with Sanofi-Aventis U.S. LLC ("Sanofi"), a global healthcare company, for the development and commercialization of Afrezza (the "Agreement").    The Agreement was filed with the SEC on November 10, 2014.   Pursuant to the Agreement, Sanofi was responsible for the global commercialization, regulatory and development activities for Afrezza, while MannKind would manufacture the drug.   Afrezza went on sale on February 3, 2015.   MannKind retained supervisory duties over the commercialization of Afrezza through a joint committee whose formation was mandated by the Agreement.   MannKind admitted that the parties frequently and transparently cooperated with respect to all issues, including sales.

7.     The FDA-mandated spirometry testing imposed a significant barrier to patient access to Afrezza.   Although many primary care providers have access to spirometers, only about 30% of endocrinologists and even fewer diabetologists — the doctors most likely to treat diabetics — have access to spirometers.   Thus, most patients would have to make appointments with and see multiple doctors before beginning even the ten day Afrezza trial period.

- 4 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

8.     During an earnings conference call to discuss the 2015 first quarter earnings and results on May 8, 2015, Defendants acknowledged that the spirometry requirement "initially slowed down the penetration of Afrezza," with Defendant Edstrom stating that "[e]ndocrinologists… do not have [] spirometers [and] thus they are forced to locate the pulmonary testing lab where spirometry could take place… [and] [t]his fact also significantly delayed the patients 10 day sample trial process, which is required before they can get their first prescription."  Nevertheless Defendants downplayed the long-term impact of this issue.  Alfred Mann ("Mann"), then MannKind's Executive Chairman of the Board of Directors, stated that "Sanofi's equipment supply organization is working on overcoming the testing obstacle."[1]  Mann further announced that MannKind sought a different solution. "We have found," Mann boasted, "an improved very inexpensive non-recording spirometering instrument that meets the standard of the American Thoracic Society.  We are evaluating a possible plan on which a doctor would purchase a device [and] [t]he cost of that meter is only about what today would typically be reimbursed on most insurance programs."  MannKind provided no specifics about the instrument.

---

[1] Mann served as the Company's Chief Executive Officer ("CEO") from before the beginning of the Class Period until January 9, 2015 and again from November 19, 2015 to January 11, 2016, and was the Executive Chairman of the Board of Directors during the entire class period.  Mr. Mann has recently passed away.  Plaintiffs intend to implead his estate.

Amended Class Action Complaint for Violation of the Federal Securities Laws

9.     On August 10, 2015, the start of the Class Period, Defendants stated that the spirometry issue no longer impeded physicians from prescribing Afrezza.    Specifically, Defendant Edstrom stated that "Sanofi has made excellent moves to address the spirometry requirements and our research shows that it's no longer a critical gating item."   Reinforcing this, Defendant Pfeffer stated "based on the statistics they [Sanofi] are tracking now, while it's not completely gone, the numbers were still an issue or small enough that it isn't believed that it's significantly impacting our sales."  Pfeffer added, "[s]o at this point, that doesn't seem to be the issue that's holding things up very much.  It slows things down, but it's not a blocking issue."

10.     Defendants further made clear that they were in close contact with Sanofi regarding any possible spirometry issues, with Defendant Pfeffer noting he had recently met with Sanofi to discuss that very issue.

11.     Instead, Defendants posed insurance coverage issues as the only impediment to Afrezza sales, but downplayed even these issues, contending that they were temporary.  Defendant Edstrom stated that while "[m]ost of the plans have not made that determination, [] they should over the coming months and that should make things simpler, we hope."

12.     MannKind continued to downplay the ongoing spirometry testing issue throughout the Class Period, reassuring investors that access to spirometry

Amended Class Action Complaint for Violation of the Federal Securities Laws

was not holding back sales of Afrezza.  Investors believed Defendants that the Company and Sanofi had solved the pulmonary testing issue.  Despite their assurances to investors, Defendants knew or were reckless in not knowing that the spirometry issue had never been solved, that the spirometry issue was impeding prescriptions of Afrezza, and, ultimately, due to the poor sales, Sanofi would terminate the Agreement.  This information was critical to investors' investment decisions.

13.    Nevertheless, on November 9, 2015, during MannKind's Q3 2015 investor conference call, Defendant Edstrom represented to analysts that their was no then current indication that Sanofi planned to terminate the Agreement.

14.    On January 5, 2016, in a press release and, later that day, during a hastily arranged conference call, MannKind announced that Sanofi was terminating the Agreement due to Afrezza's failure to meet sales forecasts. Defendant Pfeffer stated that change was "required if Afrezza were to achieve the market success that we believed and still believe should be possible," adding that "[f]uture marketing plans must center on educating patients and doctors about Afrezza's compelling value proposition."

15.    On the same day, Sanofi's spokesman, Jack Cox, sent emails to reporters giving Sanofi's reasons for terminating the Agreement.  He wrote that

Amended Class Action Complaint for Violation of the Federal Securities Laws

prescription levels for Afrezza never met even "modest expectations," adding that sales were low "despite our substantial efforts."

16.    On this news, the Company's stock fell over 48%, on January 5, 2016, dropping from $1.45 to $0.75 per share, damaging investors.

17.    On January 6, 2015, the *Los Angeles Times* published an article entitled "A Rare Stumble for Biotech Pioneer Alfred Mann." The article quoted Dr. Alan Marcus, an endocrinologist and early backer of Afrezza, who collaborated with MannKind and sponsored a planned clinical trial of Afrezza.[2] Dr. Marcus attributed the failure of Afrezza to the spirometry issue, expressing that "Sanofi offered a class, but no hands-on training with either lung-testing equipment or with the Afrezza inhalers themselves. 'Sanofi didn't have a wise plan for introducing this product,' he said."

## JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

---

[2] *See* https://clinicaltrials.gov/ct2/show/study/NCT01459133. The study was later withdrawn.

- 8 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants maintain an office in this District and a significant portion of Defendants' actions and the subsequent damages took place within and from this District.

21.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

22.    Co-Lead Plaintiff Rivkin purchased MannKind securities during the Class Period and has suffered damages as set forth in the certification presented to the Court in his motion for appointment as lead plaintiff, incorporated by reference herein.

23.    Co-Lead Plaintiff Paydar purchased MannKind securities during the Class Period and has suffered damages as set forth in the certification

Amended Class Action Complaint for Violation of the Federal Securities Laws

presented to the Court in his motion for appointment as lead plaintiff, incorporated by reference herein.

24.     Defendant MannKind is a Delaware corporation headquartered at 25134 Rye Canyon Loop, Suite 300, Valencia, California 91355. During the Class Period, the Company's stock was traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol "MNKD."

25.     Defendant Matthew Pfeffer ("Pfeffer") served as the Company's Chief Financial Officer ("CFO") during the Class Period. Defendant Pfeffer assumed the position of CEO on January 11, 2015.

26.     Defendant Hakan Edstrom ("Edstrom") served as the Company's CEO from January 9, 2015 to November 19, 2015.

27.     Defendants Pfeffer and Edstrom are collectively referred to hereinafter as the "Individual Defendants."

28.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

Amended Class Action Complaint for Violation of the Federal Securities Laws

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

29.     As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

30.     Afrezza was the Company's only FDA approved drug, and the Company's financial success was linked to Afrezza's success.  Defendants knew every aspect of the chain of events in the manufacture and

commercialization of Afrezza, and were aware of all significant business and operational developments at the Company, since Afrezza was pivotal to the Company's future financial success.  If Defendants did not inform themselves of every aspect of the chain of events during the Class Period, then Defendants made their Class Period statements regarding Afrezza without basis.

31.     MannKind is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

32.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MannKind under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     MannKind is a biopharmaceutical company, focusing on the development of new drugs.  The Company's only FDA-approved product, Afrezza, is a rapid-acting inhaled insulin approved for use by adults with type 1 and type 2 diabetes.  Diabetics inhale Afrezza at mealtime to help control their blood-sugar concentration.  Afrezza is not a substitute for long-acting insulin

Amended Class Action Complaint for Violation of the Federal Securities Laws

and must be used along with long-acting insulin.  The FDA approved Afrezza in June, 2014.

34.   Defendants tied MannKind's financial success to its ability to market Afrezza successfully.  In its 2014 10-K, MannKind acknowledged that "[w]e have expended significant time, money and effort in the development of our only approved product, Afrezza.  We anticipate that in the near term, our ability to generate revenues will depend on the successful commercialization of Afrezza."

35.   Developing an inhalable or oral insulin has been the "holy grail"[3] of diabetes research for decades, as it greatly reduces the need for diabetes sufferers to inject themselves with insulin.  At the time of Afrezza's FDA approval, diabetics had to inject their insulin to manage their blood-glucose concentration after meals.

36.   Because diabetics inhale Afrezza, the FDA was concerned about its use by smokers, and by those suffering from serious pulmonary diseases or conditions such as chronic pulmonary disease or asthma, as well as the long-term effects of inhaling a hormone such as insulin.  Accordingly, the FDA imposed strict guidelines for physicians prescribing Afrezza.  Doctors were

[3]  *See* http://www.diabetesincontrol.com/moving-forward-with-oral-insulin-the-holy-grail-of-diabetes-therapy/;        http://www.ahcmedia.com/articles/33691-researchers-take-first-steps-toward-the-holy-grail-of-insulin-inhalation.

Amended Class Action Complaint for Violation of the Federal Securities Laws

required to perform a pulmonary function test called a spirometry test, using a device called a spirometer, on prospective Afrezza patients, to determine if a patient had an existing pulmonary disease.  The FDA required physicians to update pulmonary testing on Afrezza patients semi-annually.  Finally, the FDA mandated that patients undergo a ten day trial period taking Afrezza, followed by a full prescription only if the patient reacted well.

37.     On September 24, 2014, MannKind announced that on August 11, 2014, it had entered the Agreement with Sanofi for the development and commercialization of Afrezza.  Pursuant to the Agreement, signed by Mann and Defendant Pfeffer, Sanofi was responsible for the global commercialization, regulatory and development activities for Afrezza, while MannKind would manufacture the drug.  Sanofi paid MannKind an upfront payment of $150 million, and promised milestone payments of up to $775 million, depending upon meeting regulatory and developmental targets and actual sales.  Pursuant to the Agreement, Sanofi would receive 65% of any profits, with MannKind receiving 35%.  Afrezza went on sale on February 3, 2015.

38.     MannKind    retained    supervisory    duties    over    Afrezza's commercialization.   Article 3.1 of the Agreement required the parties to establish a Joint Afrezza Committee ("JAC"), comprised equally of representatives of MannKind and Sanofi.  The purpose of the JAC was to

Amended Class Action Complaint for Violation of the Federal Securities Laws

"oversee, review and coordinate the activities of the Parties under this Agreement with regard to the Development, regulatory and other activities relating to Product in the Field." The JAC was also responsible for "reviewing and approving Commercialization Plan(s), Commercialization Budget(s), and updates and amendments thereto."

39. Further, Article 3.1 stated that the JAC was responsible for "providing a forum for discussion as to whether the content of a Commercialization Plan (or any such plan as proposed to be updated or amended) is sufficient to satisfy Sanofi's obligations to use Commercially Reasonable Efforts in accordance with Section 5.1(c)." Section 5.1(c), titled "Commercialization of Product," required Sanofi to "prepare and submit to the JAC a three-year, non-binding plan for the marketing, promotion and pricing of [Afrezza] in such major market or Country," and to "prepare and submit to the JAC for approval an initial Commercialization Budget to be included in each Commercialization Plan that specifies amounts to be spent on Product launch, detailing, meetings, symposiums, Congressional support, clinical support, brand support and other items."

40. Article 12 of the Agreement detailed how either Sanofi or MannKind could terminate the Agreement. Either party could terminate for "Material Breach," by "giving notice in writing specifying the breach and its

Amended Class Action Complaint for Violation of the Federal Securities Laws

claim of right to terminate." The other party would then have 90 days "to rectify the breach." If not rectified to the terminating party's satisfaction, the Agreement would be terminated. Further, pursuant to Article 12.3, Sanofi could terminate for cause with ninety days written notice if "at any time on or after January 1, 2016, Sanofi determines in good faith that Commercialization of Product is no longer economically viable in the United States." In addition, pursuant to the same Article of the Agreement, Sanofi, and Sanofi alone, had the right to terminate the agreement without cause, the Agreement reading "at any time on or after January 1, 2016, upon delivery of at least six (6) months' prior written notice to MannKind, Sanofi shall have the right to terminate this Agreement for any reason… in its entirety."

41. MannKind had the right to terminate the Agreement in its entirety if "Sanofi is the Breaching Party and the breach is with respect to Sanofi's failure to comply with its obligation to use Commercially Reasonable Efforts with respect to… the United States." MannKind never exercised this right.

42. In MannKind's 2014 10-K, Defendants cautioned of several reasons that MannKind and Sanofi might be unable to commercialize Afrezza, including "treatment and dosage regimen, potential adverse effects, the availability of alternative treatments and lack of coverage or adequate reimbursement." The Company further included a lengthy list of reasons why

Amended Class Action Complaint for Violation of the Federal Securities Laws

physicians and patients might not accept Afrezza, including "effectiveness of efforts by us or our marketing partner(s) to educate physicians about the benefits and advantages of AFREZZA or our other products and to provide adequate support for them, and the perceived advantages and disadvantages of competitive products," and "convenience and ease of administration relative to existing treatment methods." The 2014 10-K further listed insurance coverage issues as possibly affecting commercialization. The Company never specifically mentioned spirometry issues as even potentially affecting the drug's successful commercialization.

43. Throughout the Class Period, however, and as Defendants knew, the FDA requirement of a pre-prescription spirometry test imposed a significant barrier to physician and patient acceptance of Afrezza. During a May 8, 2015 earnings conference call to discuss the 2015 first quarter results, Defendants admitted that the spirometry test was "simple," but that "although primary care physicians generally have spirometer instruments, very few diabetologists and only about 30% of endocrinologists do." They continued that, "[a]rrangements for spirometering and all other requirements in this leading therapy takes considerable time and those pose obstacles delaying initiation of therapy." Endocrinologists and diabetologists are the doctors most likely to treat diabetics. Thus, with the imposition of the pulmonary function test, many

Amended Class Action Complaint for Violation of the Federal Securities Laws

patients would have to see multiple doctors before beginning even the ten day trial period for Afrezza.

44.     The Company admitted that it was actively involved in dealing with the spirometry problem with Sanofi.  During the May 8 call, in response to an analyst's question regarding "practical steps that the [joint venture] might be taking to facilitate this patient flow when it comes to lung function testing," Defendant Pfeffer stated that "[w]e certainly know very specifically what Sanofi is planning to do," and indicated that MannKind was "quite pleased" with Sanofi's "very active stance in working on" the spirometry and other issues.  Further, Defendant Edstrom stated that:

> we have what's called the Joint AFREZZA Committee, which is really the marketing and commercial group that is working together in between Sanofi and MannKind.  So ***all major initiatives are being discussed there***.  All the metrics in terms of measuring the performance and certainly feedback on performance.   Across sales, clinical, regulatory, manufacturing parameters are being discussed.   I would say from that point of view ***it is an open and frequent collaboration in between the group.  So I would say from that point of view transparency is good***.  [Emphasis added].

45.     During the same call, Defendants acknowledged that the spirometry requirement "initially slowed" physician and patient acceptance of Afrezza.  Defendant Edstrom stated that "[e]ndocrinologists… do not have []

Amended Class Action Complaint for Violation of the Federal Securities Laws

spirometers [and] thus they are forced to locate the pulmonary testing lab where spirometer could take place, [and] [t]his fact also significantly delayed the patients 10 day sample trial process, which is required before they can get their first prescription."  Defendants nevertheless downplayed the long-term impact of this issue.  Executive Chairman of the Board of Directors Mann stated not only that "Sanofi's equipment supply organization is working on overcoming the testing obstacle" but that "we at MannKind are investigating a possible different solution."  Mann continued that the Company had "found an improved very inexpensive non-recording spirometering instrument that meets the standard of the American Thoracic Society.  We are evaluating a possible plan on which a doctor would purchase a device [and] [t]he cost of that meter is only about what today would typically be reimbursed on most insurance programs."

46.    Analysts were keenly aware of the spirometry issue.  In a May 10, 2015 report rating the Company as a "Buy," an analyst at Jefferies noted a "gating problem" with "lung function testing," writing that "[a]s specified in the Afrezza label, prior to prescribing the drug, doctors need to test lung function with a spirometer.  This means a doctor needs to either have a spirometer on hand or refer the patient to a specialist who can perform the test."  The Jeffries analyst continued that "[a]lthough some endocrinologists have spirometers, MNKD noted that many do not.  MNKD and partner Sanofi are working on

- 19 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

solutions to ease the burden of lung function testing, including offering low-cost spirometers to doctors…. [w]e are encouraged that MNKD is taking a proactive approach to addressing [this] problem." That same day, analyst RBC Capital Markets, in a report rating MannKind as "Outperform," noted "lung function testing" as a "hurdle."

47. On August 10, 2015, MannKind filed its Form 10-Q for the second quarter of 2015 ("2015 2Q 10-Q"). All of the cautionary statements from the 2014 10-K were repeated verbatim. MannKind again never specifically mentioned spirometry issues as even potentially affecting the drug's successful commercialization.

48. Defendants instead indicated to the market that the pulmonary function testing no longer impeded Sanofi's efforts to market Afrezza. On August 10, 2015, the first day of the class period, the Company stated that the spirometer issue was no longer a "critical gating item" affecting sales. Instead, Defendants posed insurance coverage issues as the only impediment to sales of Afrezza, but downplayed even these issues, contending that they were temporary.

49. Analysts picked up on MannKind's message that the spirometry issues were no longer holding back sales. In an August 10, 2015 analyst report,

Amended Class Action Complaint for Violation of the Federal Securities Laws

RBC Capital Markets, still rating MannKind stock as "Outperform," specifically noted that "lung function testing" was no longer a "barrier."

50.     On November 9, 2015, MannKind filed its Form 10-Q for the third quarter of 2015 ("2015 3Q 10-Q").  All of the cautionary statements from the 2014 10-K and 2015 2Q 10-Q were repeated verbatim.  MannKind again never specifically mentioned spirometry issues as even potentially affecting the drug's successful commercialization.

51.     That same day, November 9, 2015, during an earnings conference call to discuss third quarter 2015 results, the Company again reassured investors that the spirometry issue was no longer affecting sales of Afrezza.

52.     MannKind played an active role in marketing Afrezza, speaking directly with potential prescribing physicians and patients.   During the November 9, 2015 earnings conference call, CEO Edstrom delivered prepared remarks, stating:

> Doctor awareness is developing now during the launch period. And we have to try to be patient while these efforts are underway.  The current [direct to consumer] campaign has significantly raised awareness of Afrezza among the public. ***We have received an overwhelming number of consumer and doctor inquiries through the publication of ads***. While this has not yet translated into much higher sales, the weekly penetration is improving, and it demonstrates a high level of interest in Afrezza.  We expect Sanofi to use this information in their

marketing efforts going forward in conjunction with the afrezza.com and the afrezzapro.com websites. And *in our conversations with doctors, the feedback is that patient satisfaction with Afrezza is high*. This quote from one of the Afrezza patients is quite representative. I'm happy to report that I achieved my best A1C mark in 27 years as a diabetic. My reading of 7.4 was 1.3 points lower than my previous reading in June. We believe patients like the versatility and the flexibility that Afrezza affords them in dosing, in addition to the dosing convenience. So *based on the feedback from many doctors that I've spoken to*, let's say that once the patients have had the opportunity to try Afrezza, they are very happy with the result. The challenge now is to translate that interest into prescriptions by addressing the market access barriers. [Emphasis added].

53. Moreover, in response to questions from analysts, Defendant Edstrom expressly represented that MannKind had no indication that Sanofi intended on terminating the Agreement.

54. Former employee 1 ("FE") was a diabetic sales specialist for Sanofi in the greater Atlanta, Georgia area from December, 2012 through August of 2015. He reported to John Schobler ("Schobler"), district sales manager for Sanofi. According to FE1, Sanofi maintained sales "pods" each comprising four sales representatives, including one sales representative dedicated to sales of new products. FE1 was the new product specialist in his pod. FE1 was responsible for selling Afrezza to approximately 120 endocrinologists in the Atlanta area. FE1 was Sanofi's most successful Afrezza

Amended Class Action Complaint for Violation of the Federal Securities Laws

salesperson from launch to his departure.  As with most pharmaceutical sales, Sanofi's sales representatives were paid through incentive compensation packages, incentivizing FE1 to sell as much Afrezza as possible.  FE1 participated in a four day conference in Las Vegas, Nevada, to receive certification in Afrezza sales, culminating in a launch party, at which Alfred Mann addressed Sanofi's sales representatives.

55.     According to FE1, the spirometry issue, unique to Afrezza, was the major impediment to Afrezza prescription and sales.  No other issues unique to Afrezza, as opposed to issues present in the launch of any new drug, caused difficulties in convincing doctors to prescribe it.  Again, according to FE1, greater than 85% of endocrinologists to whom he marketed Afrezza, expressed concern about the spirometry issue as the reason for declining to prescribe the drug.  Endocrinologists also expressed to FE1 their concern about the requirement to test patients' pulmonary function semi-annually. Endocrinologists told FE1 that the spirometry issue encompassed more than a lack of equipment, but expressed concern for the need to train staff to perform lung function tests, and to bill for those tests.  As a direct result, according to FE1, Afrezza sales were, from the launch, dramatically lower than Sanofi and MannKind expected.

Amended Class Action Complaint for Violation of the Federal Securities Laws

56.     According to FE1, Sanofi had no plan to address physicians' concerns about the spirometry issue, and made little to no effort to deal with insurance coverage issues.  Indeed, from the launch, according to FE1, Sanofi dedicated few resources or support to Afrezza sales.  The budget for physician outreach was relatively very low, and Sanofi provided its sales force with limited marketing materials.  As a result, from the launch of Afrezza, according to FE1, sales were dramatically lower than Sanofi's and MannKind's expectations.  FE1 stated that most salespeople were not meeting their sales goals.  FE1 attributed these poor sales directly to pushback from doctors surrounding the spirometry issue.

57.     After the first quarter of Afrezza sales, before the start of the Class Period, Schobler told FE1 that Sanofi needed to increase Afrezza sales numbers or it might stop promoting the drug, which, in turn, would depress further the sales force's incentive compensation.   According to FE1, Sanofi took the approach that if Afrezza was not a blockbuster out of the gate, Sanofi would cease selling it.  FE1 had seen Sanofi adopt this strategy before with respect to the drug Auvi-Q, a drug that he sold.  After six months, sales of Auvi-Q lagged Sanofi's expectations, causing Sanofi to stop promoting the drug.  In response to the poor early Afrezza sales numbers, Sanofi committed no further resources.

Amended Class Action Complaint for Violation of the Federal Securities Laws

58.    MannKind's close collaboration with Sanofi's marketing efforts continued.  In a November 10, 2015 report by analyst JMP Securities ("JMP"), the analyst noted that MannKind had "expressed enthusiasm for [Sanofi's] marketing campaign, including DTC [direct to consumer] advertising."

59.    The financial press dutifully reinforced MannKind's view that any spirometry issue had been solved.  On December 18, 2015, in an article in *The Motley Fool* entitled "MannKind Overcomes 1 Hurdle – but Bigger Challenges Await," and reprinted by NASDAQ, author Brian Feroldi wrote, with respect to the spirometry issue, that "it looks like the company has successfully addressed one of the barriers that has slowed adoption."  The article went on to quote Defendant Edstrom's statements from the November 9, 2015 earnings call that "in terms of pulmonary function testing, with the support of the sales reps and all the people from Sanofi, doctors know where to turn in making that happen. So that was initially a delay. But they know how to address that."

60.    Despite their assurances to investors, Defendants knew that the spirometry issue had never been solved, and that doctors were not prescribing Afrezza because of this issue.

**Material False and Misleading Statements**

61.    During an earnings conference call on August 10, 2015, Defendant Edstrom stated that "Sanofi has made excellent moves to address the spirometry

- 25 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

requirements and our research shows that it's no longer a critical gating item."

Reinforcing this announcement, Defendant Pfeffer, in response to an analyst's question, answered that with respect to the spirometry issue "based on the statistics they [Sanofi] are tracking now, while it's not completely gone, the numbers were still an issue or small enough that it isn't believed that it's significantly impacting our sales," adding in response to a second inquiry, "[s]o at this point, that doesn't seem to be the issue that's holding things up very much.  It slows things down, but it's not a blocking issue."

62.    The foregoing statements were materially false and misleading because Defendants, who were in close contact with Sanofi regarding marketing and sales of Afrezza, knew or were reckless in not knowing and disclosing that spirometry issues persisted, and were negatively affecting prescription and sale of Afrezza, and that in response to the poor early Afrezza sales numbers, Sanofi committed no further resources.

63.    On November 9, 2015, during an earnings conference call, Defendants again denied any issues with spirometry affecting sales.  Defendant Edstrom was specifically asked whether insurance issues, rather than pulmonary function testing, was still the significant issue facing the Company. Edstrom reassured investors that access to spirometry was not holding back sales of Afrezza, stating "I would say yes. Certainly in terms of pulmonary

- 26 -

function testing, with the support of the sales reps and all the people from Sanofi, doctors know where to turn in making that happen. So that was initially a delay. But they know how to address that."

64.     The foregoing statements were materially false and misleading because Defendants, who were in close contact with Sanofi regarding marketing and sales of Afrezza, knew or were reckless in not knowing and disclosing that spirometry issues persisted, and were negatively affecting prescription and sale of Afrezza, and that in response to the poor early Afrezza sales numbers, Sanofi committed no further resources.

65.     In the 2014 10-K, Defendants cautioned of several reasons that Afrezza might not succeed, including "treatment and dosage regimen, potential adverse effects, the availability of alternative treatments and lack of coverage or adequate reimbursement."  The Company further included a lengthy list of reasons that Afrezza might not gain market acceptance, including "effectiveness of efforts by us or our marketing partner(s) to educate physicians about the benefits and advantages of AFREZZA or our other products and to provide adequate support for them, and the perceived advantages and disadvantages of competitive products," and "convenience and ease of administration relative to existing treatment methods."  The 2014 10-K further listed insurance coverage issues as potentially affecting commercialization.  The Company never

Amended Class Action Complaint for Violation of the Federal Securities Laws

specifically mentioned spirometry issues as even potentially affecting the drug's successful commercialization.

66.   On August 10, 2015, MannKind filed its 2015 2Q 10-Q.  All of the cautionary statements from the 2014 10-K were repeated verbatim.  MannKind again never specifically mentioned spirometry issues as even potentially affecting the drug's successful commercialization.

67.   On November 9, 2015, MannKind filed its 2015 3Q 10-Q.  All of the cautionary statements from the 2014 10-K and 2015 2Q 10-Q were repeated verbatim.  MannKind again never specifically mentioned spirometry issues as even potentially affecting the drug's successful commercialization.

68.   The foregoing statements that Defendants incorporated into the Class Period SEC filings were materially false and misleading because Defendants, who were in close contact with Sanofi and with potential prescribing physicians and patients regarding marketing and sales of Afrezza, and who had oversight responsibilities over commercialization of Afrezza through the JAC, and transparent and frequent contact with Sanofi regarding commercialization issues, knew or were reckless in not knowing and disclosing that spirometry issues persisted, and were negatively affecting prescription and, thus, sales of Afrezza, and that in response to the poor early Afrezza sales numbers, Sanofi committed no further resources.

Amended Class Action Complaint for Violation of the Federal Securities Laws

69.     During the November 9, 2015 earnings conference call, in response to an analyst's question regarding Sanofi's right to terminate the Agreement in January of 2016, Defendant Edstrom stated that "at this time we have certainly no indication that Sanofi is [planning] [to terminate] the partnership.  Actually our teams are working very closely together on plans for 2016 and putting budgets together.  So we are certainly operating under the assumption that we will continue to pursue the partnership and the associated Afrezza activities."

70.     The foregoing statements were materially false and misleading because Defendants, who were in close contact with Sanofi, and with potential prescribing physicians and patients regarding marketing and sales of Afrezza, and who had oversight responsibilities over commercialization of Afrezza through the JAC, and transparent and frequent contact with Sanofi regarding commercialization issues, knew or were reckless in not knowing and disclosing that in response to the poor early Afrezza sales numbers, Sanofi committed no further resources.

**The Truth Emerges**

71.     On January 5, 2016, in a press release titled "MannKind Corporation announces Termination of License and Collaboration Agreement with Sanofi," and, later that day, during a hastily arranged conference call,

- 29 -

MannKind announced that Sanofi was terminating the Agreement with MannKind because "sales forecasts were not met."   Defendant Pfeffer stated that change was "required if Afrezza were to achieve the market success that we believed and still believe should be possible," adding that "[f]uture marketing plans must center on educating patients and doctors about Afrezza's compelling value proposition."

72.   A Form 8-K dated January 4, 2016, and filed with the SEC on January 8, 2016, made clear that Sanofi's announcement of termination of the Agreement was irreversible.  MannKind wrote that:

> "On January 4, 2016, MannKind… received written notice from Sanofi… of Sanofi's election to terminate in its entirety the License and Collaboration Agreement, dated August 11, 2014…. Sanofi's notice indicated that the termination was pursuant to Sanofi's right to terminate the License Agreement upon Sanofi's good faith determination that the commercialization of AFREZZA is no longer economically viable in the United States, in which case the effective date of termination will be April 3, 2016.  In the alternative, Sanofi indicated that the termination was also pursuant to its right to terminate the License Agreement for any reason, in which case the effective date of termination will be July 4, 2016."

73.   On the same day, Sanofi's spokesman, Jack Cox, sent emails to reporters giving Sanofi's reasons for terminating the Agreement.  He wrote that

- 30 -

prescription levels for Afrezza never met even "modest expectations," adding that sales were low "despite our substantial efforts."

74.    On this news, the Company's stock fell over 48%, on January 5, 2016, dropping from $1.45 to $0.75 per share, damaging investors.

75.    On January 6, 2016, the *Los Angeles Times* published an article entitled "A rare stumble for biotech pioneer Alfred Mann."  Dr. Alan Marcus, an endocrinologist and early backer of Afrezza, who collaborated with MannKind and sponsored a planned clinical trial of Afrezza,[4] was cited, concluding that the spirometry issue had never been solved, with the article stating that "[t]hose are tests endocrinologists don't typically perform. Marcus said Sanofi offered a class, but no hands-on training with either lung-testing equipment or with the Afrezza inhalers themselves.  'Sanofi didn't have a wise plan for introducing this product,' he said."

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

76.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired MannKind securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the

---

[4] *See* https://clinicaltrials.gov/ct2/show/study/NCT01459133.  The study was later withdrawn.

Amended Class Action Complaint for Violation of the Federal Securities Laws

revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MannKind securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MannKind or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

78.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in

Amended Class Action Complaint for Violation of the Federal Securities Laws

class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

80.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of MannKind;

- whether the Individual Defendants caused MannKind to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of MannKind securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress

- 33 -

the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

82.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- MannKind securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold MannKind securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

83.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

Amended Class Action Complaint for Violation of the Federal Securities Laws

84.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

85.     At all relevant times, the market for MannKind securities was an efficient market.

86.     As a result of the foregoing, the market for MannKind securities promptly digested current information regarding MannKind from all publicly available sources and reflected such information in MannKind's stock price. Under these circumstances, all purchasers of MannKind securities during the Class Period suffered similar injury through their purchase of MannKind securities at artificially inflated prices, and a presumption of reliance applies.

## CAUSES OF ACTION

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against All Defendants

87.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

88.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

89.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MannKind securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire MannKind securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

90.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the

Amended Class Action Complaint for Violation of the Federal Securities Laws

preparation and/or issuance of the annual reports, SEC filings, press releases, conference call statements and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for MannKind securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MannKind's disclosure controls and procedures.

91.    By virtue of their positions at MannKind, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

92.    During the Class Period, MannKind securities were traded on an active and efficient market. Plaintiffs and the other members of the Class,

relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired the ADSs of MannKind securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of MannKind securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of MannKind securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

93.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MannKind securities.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

94.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

- 38 -

95.    Plaintiffs sue the Individual Defendants herein as controlling persons of MannKind.

96.    By virtue of their high-level position, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.   In particular, the Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of MannKind and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein.   Those Individual Defendants exercised that power.

98.    As set forth above, MannKind and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Amended Complaint.

Amended Class Action Complaint for Violation of the Federal Securities Laws

99.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

100.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.      Determining that this action is a proper class action and certifying Co-Lead Plaintiffs Rivkin and Paydar as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Co-Lead Plaintiffs' counsel as Lead Counsel;

b.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

Amended Class Action Complaint for Violation of the Federal Securities Laws

d.     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: June 15, 2016                 Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg, Esq.
101 Greenwood Ave, Suite 440
Jenkintown, PA 19046
Telephone: (215)600-2817
Email: jgoldberg@rosenlegal.com

*Lead Counsel for Co-Lead Plaintiffs and the Class*

Amended Class Action Complaint for Violation of the Federal Securities Laws

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2016, I electronically filed the foregoing *Amended Class Action Complaint for Violation of the Federal Securities Laws* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

- 42 -